AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, COUNCIL 25 v WAYNE COUNTY

Docket No. 298655. Submitted March 2, 2011, at Detroit. Decided March
24, 2011, at 9:00 a.m.

The American Federation of State, County and Municipal Employees, Council 25 brought an action in the Wayne Circuit Court against Wayne County, seeking an order compelling the county to comply with a collective-bargaining agreement (CBA) between the union and the county and an arbitrator's ruling that interpreted the CBA with respect to the assignment or selection of deputy circuit court clerks to serve in the courtrooms of the judges of the Wayne Circuit Court (WCC). The WCC had promulgated Local Administrative Order No. 2005-06 (LAO 2005-06) in response to the arbitrator's ruling. LAO 2005-06 provided, in relevant part, that deputy circuit court clerks would be assigned to a judge's courtroom only when the judge approves of such assignment and that LAO 2005-06 superseded the arbitrator's ruling to the extent that the arbitrator had ruled that the CBA required deputy circuit court clerks to be appointed from an appropriate applicant pool on the basis of seniority. LAO 2005-06 expressly indicated that the WCC was acting pursuant to its constitutional authority pertaining to court administration. Following motions for summary disposition by the union and the county, the WCC was allowed to intervene in the action as a defendant. After the WCC filed a counterclaim and a cross-claim, the union filed additional motions for summary disposition and the WCC filed its own motion for summary disposition. The trial court, Matthew S. Switalski, J., sitting by assignment, granted summary disposition in favor of the union, declaring as a matter of law that the arbitration ruling governed the assignment of WCC deputy court clerks. The WCC appealed. The Court of Appeals, STEPHENS, P.J., and ZAHRA and MURRAY, JJ., granted the WCC's motion for a stay pending the appeal or further order of the Court in an unpublished order entered July 20, 2010 (Docket No. 298655). The Supreme Court then denied an application for leave to appeal, but directed the Court of Appeals to decide the case on an expedited basis in light of the importance of the issues. 488 Mich 1008 (2010).

The Court of Appeals *held*:

1. The WCC was not bound by the CBA and the CBA-based arbitration ruling under common-law principles associated with contract formation and liability. The WCC, which was not a party to the CBA or the arbitration proceedings, was not bound under the contract-related principles of incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel.

2. A contract based on the public employment relations act (PERA), MCL 423.201 *et seq.*, such as the CBA involved in this case, and a related arbitration award that infringe on the judicial branch's inherent constitutional powers cannot be enforced to the extent of the encroachment. When application of PERA impinges on the judiciary's inherent constitutional powers, PERA cannot prevail.

3. The assignment or selection of a particular court clerk to serve in a judge's courtroom falls under the umbrella of the judiciary's administrative and managerial authority to carry out the court's day-to-day internal operations and to control personnel matters with regard to an individual, a court clerk, who indisputably is providing court services. The judicial branch's inherent constitutional powers encompass both the selection of a court clerk to work in a courtroom and control over the clerk in the courtroom after the selection is made. A judge has the exclusive constitutional authority to select a court clerk who the judge opines is the best suited to assist the judge in effectively and efficiently operating the judge's courtroom.

4. The circuit court is vested with the constitutional authority to direct the clerk of the circuit court to perform noncustodial ministerial duties pertaining to court administration as the court sees fit. The constitutional authority includes the discretion to create duties, abolish duties, or divide duties between the clerk and the other personnel, as well as the right to dictate the scope and the form of the performance of such noncustodial ministerial duties. The directives contained in LAO 2005-06 constitute noncustodial ministerial tasks relative to the division of duties and the scope and the form of performances within the WCC. LAO 2005-06 was a proper exercise of the WCC's exclusive judicial authority under the Michigan Constitution that was permissible because it concerned internal court management.

5. The assignment of a deputy court clerk to a WCC courtroom is patently a judicial matter and is not subject matter falling within the powers of the legislative branch. The order granting summary disposition in favor of the union is reversed and the case

is remanded to the trial court for entry of a judgment in favor of the WCC. This judgment has immediate effect.

Reversed and remanded.

1. CONSTITUTIONAL LAW — CONFLICT OF LAWS — PUBLIC EMPLOYMENT RELATIONS ACT — CONTRACTS — ARBITRATION.

A contract based on the public employment relations act and a related arbitration award that infringe on the judicial branch's inherent constitutional powers may not be enforced to the extent of such encroachment (MCL 423.201 *et seq.*).

2. CONSTITUTIONAL LAW — SEPARATION OF POWERS — INHERENT CONSTITUTIONAL POWERS — JUDICIAL BRANCH — COURT CLERKS.

The judicial branch's inherent constitutional powers encompass both the selection of a court clerk to work in a courtroom and the control over the clerk after the selection is made; a judge has the exclusive constitutional authority to select a court clerk who the judge opines is best suited to assist the judge in effectively and efficiently operating the judge's courtroom.

*Miller Cohen, P.L.C.* (by *Bruce A. Miller* and *Richard G. Mack, Jr.*), for the American Federation of State, County and Municipal Employees, Council 25.

*Marianne Talon*, Corporation Counsel, and *Cheryl Yapo*, Assistant Corporation Counsel, for Wayne County.

*Allan Falk, P.C.* (by *Allan Falk*), for the Wayne Circuit Court.

Before: MURPHY, C.J., and STEPHENS and M. J. KELLY, JJ.

MURPHY, C.J. In this case, intervening defendant, the Wayne Circuit Court (WCC), argued that its judges have the exclusive authority to make the determination with respect to the assignment or selection of a deputy circuit court clerk (hereafter "court clerk") to serve in a judge's courtroom, as reflected in Local Administrative

Order No. 2005-06 (LAO 2005-06).[1] Plaintiff, American Federation of State, County and Municipal Employees, Council 25 (hereafter "the union"), contended that the assignment is solely governed and controlled by the collective-bargaining agreement (CBA) between the union and defendant, Wayne County (hereafter "the county"), as implemented by the Wayne County Clerk (hereafter "the county clerk") and as interpreted in an underlying arbitration ruling that was entered before the adoption of LAO 2005-06. The county declined to take a stance on the merit of the arguments posed by the WCC and the union did not offer its own resolution of the issues presented. The trial court, sitting by assignment, sided with the union, entering an order granting summary disposition in favor of the union and denying the WCC's competing motion for summary disposition. We agree with the position proffered by the WCC. Accordingly, we reverse the trial court's order and remand for entry of an order granting summary disposition in favor of the WCC.

I. FACTS AND PROCEDURAL HISTORY

On March 30, 2007, the union filed a "complaint to compel" against the county, alleging that the union is a labor organization for purposes of the public employment relations act (PERA), MCL 423.201 et seq., that it represents employees engaged in public employment in Wayne County, that the county is the "public employer" of these employees for purposes of PERA, and that the union and the county entered into the CBA at issue, effective December 1, 2000. According to the union, the CBA covered various classifications of county employ-

---

[1] This opinion applies equally to judges and referees, but we shall, for the most part, refer solely to judges throughout the opinion for ease of reference.

ees, including court clerks, and the CBA provided the procedure for processing and adjusting grievances, culminating in binding arbitration upon an impasse. The union alleged that in 2002 it filed two grievances on behalf of court clerks after the county failed to post and fill a court clerk vacancy in a juvenile court courtroom in accordance with the CBA. The union specifically complained that the county failed to comply with the CBA, as construed by the union, when it did not fill the position on the basis of seniority and improperly limited the pool of applicants. The union maintained that the arbitrator issued an opinion and award in December 2004, finding in favor of the union and the grieving employees with respect to the grievances and interpretation of the CBA. The union alleged that the county had refused since January 2007 to comply with the arbitrator's ruling, posting and filling court clerk vacancies in certain courtrooms without regard to seniority and absent consideration of the appropriate applicant pool. In its prayer for relief, the union requested that the trial court order the county to comply with the arbitration ruling and to repost and refill the vacancies in accordance with the ruling and the CBA.

The arbitrator's written ruling and the CBA provide additional details and enlightenment. We initially note that under the CBA, §10.04, Step 5F, there could be no appeal from the arbitrator's decision if rendered in a manner consistent with the arbitrator's jurisdiction and authority as provided under the CBA, and the decision was deemed final and binding "on the Employer, on the employee or employees, and the Union." Pursuant to §§ 17.01 and 17.02(A) of the CBA, when there exists an intradepartmental job vacancy resulting from the creation of a new position, a transfer, a resignation, a termination, a retirement, or other means, "an employee who holds the same classification

and has completed one (1) year of service within the division may exercise his or her seniority for the selection of a job." The CBA also provides, under § 17.02(G), that "[a] senior employee deemed not qualified for a job . . . shall have recourse to the grievance procedure." These CBA sections are general in scope and not specifically tailored to court clerks or any other particular employment classification. In its written ruling, the arbitrator concluded:

> Per the contract language[,] a vacant position is to be awarded to the employee, in the section of the division having the vacant position, who (1) holds the same classification, (2) has completed one year of service within the division and (3) elects to exercise his or her seniority. Under the CBA, subordination of seniority is permitted only upon a determination that a senior employee is not qualified for a job. There is no contention in this matter that any of the court clerks lack the knowledge, skills and ability required to serve in any courtroom at the [Lincoln Hall of Justice] LHJ. Absent some ambiguity in the contract language at issue, the claim of a past practice is unavailing to modify a clear promise.
>
> The County opines that prior to the instant matter the Union had not grieved or protested the County's restriction of the applicant pool for court clerk vacancies in judge-led courtrooms; thus, it may be found that the Union has acquiesced in the County's practice. One of the rules of contract interpretation related to the use of custom and practice is that a party's failure to file grievances or to protest past violations of a clear contract rule does not bar that party, after notice to the violator, from insisting upon compliance with the clear contract requirement in future cases. I conclude there is no basis for finding the Union acquiesced in the County's practice such that it should be held that the parties have, by their conduct, amended the CBA language on filling vacancies. I further conclude that the County violated the CBA when it limited the pool of court clerks who could apply for the . . . position.

... I believe the foregoing discussions about what is required by Article 17 and particularly section [17.02(A) compel] a determination that the County violated the CBA by filling the position at issue with an employee who had less seniority than other interested applicants. Given the findings and conclusions above, the grievances must be granted.

By way of further background, in April 2005, the WCC's chief judge penned a letter that was delivered to the county clerk, indicating that the WCC would not abide by the arbitrator's ruling. The chief judge enclosed a draft of a LAO that would supersede the arbitration award and be implemented unless the WCC and the county clerk could come to a consensual resolution. The chief judge noted that the WCC had not been aware of the arbitration proceedings until after the arbitrator's ruling was entered and that the time-honored practice over the past 30 years had been to allow the judges to choose the courtroom clerks to be assigned to their particular courtrooms. When no consensual resolution could be reached, the WCC promulgated LAO 2005-06, which was issued on June 2, 2005.

LAO 2005-06 provided that upon written request of the chief judge or the court administrator, the county clerk shall be responsible for assigning a court clerk to perform clerk functions in a presiding judge's or referee's courtroom, that the judge or referee assigned to a particular courtroom shall notify the county clerk of the person from the appropriate pool of interested, eligible clerks whom the judge or referee approves, and that the county clerk "shall then assign that person to perform court clerk functions in that courtroom." Additionally, LAO 2005-06 provided that the county clerk "shall not permanently assign to any courtroom or transfer from any courtroom a court clerk without the prior written consent of the presiding courtroom judge or ref-

eree . . . ." It further stated that on the written request of
the court administrator, the county clerk shall remove a
court clerk previously assigned to a courtroom and assign
a different court clerk consistent with the procedures in
LAO 2005-06. Finally, LAO 2005-06 provided that it
superseded the arbitration ruling discussed above and
that, where not in conflict with LAO 2005-06, all other
terms and conditions of the county's civil service rules and
the CBA shall prevail. Under LAO 2005-06, seniority does
not govern the assignment of a court clerk to a judge's or
referee's courtroom. LAO 2005-06 expressly indicated
that the WCC was acting pursuant to its constitutional
authority to direct the county clerk, sitting as the clerk of
the circuit court, "to perform noncustodial ministerial
duties pertaining to court administration . . . ." The order
further explained that, for purposes of efficiently and
properly administering justice, the WCC had the author-
ity to control its courtrooms and, more particularly, a
presiding judge or referee had the authority to control his
or her courtroom, which included control over the selec-
tion of a court clerk to work in the courtroom.

On June 8, 2005, the Michigan Supreme Court's
State Court Administrative Office (SCAO) prepared a
letter addressed to the chief judge of the WCC, which
advised the chief judge that LAO 2005-06 conformed to
the requirements of MCR 8.112(B) and was being
accepted and filed. On July 27, 2006, the chief judge of
the WCC entered an order regarding LAO 2005-06 that
was directed at the county clerk. The order indicated
that it had come to the attention of the chief judge that
the county clerk "may decline to follow the dictates of
LAO 2005-06 in light of [the] arbitrator's ruling . . . and
the terms of [the CBA]." The order mandated the
county clerk to comply with LAO 2005-06, noting, once
again, that the WCC and its judges control the court-

rooms under the judicial branch's constitutional powers. Subsequently, grievances were filed by the union in 2007 when court clerks complained that the process of assigning them to certain courtrooms was not in accordance with their seniority status, the CBA, and the arbitration ruling. Instead, the assignment process was being governed by LAO 2005-06 and without regard to seniority.

In the instant litigation, which was commenced while the grievances were pending, the union filed a motion for summary disposition, arguing that the chief judge of the WCC lacked the authority to overturn and reject the CBA and the arbitrator's ruling. The union also contended that the arbitration award had to be enforced because it drew its essence from the CBA. The county filed a response to the union's motion for summary disposition and made its own request that the court enter an order granting summary disposition in favor of the county. In September 2008, an order was entered allowing the WCC to intervene as a party defendant. In November 2008, an order was entered allowing the union to supplement its previous motion for summary disposition and giving the county and the WCC an opportunity to respond to any supplemental motion. In February 2009, and before any further motions or responses were filed pertaining to summary disposition, the WCC formally filed an answer to the union's complaint. At the same time, the WCC filed a counterclaim and a cross-claim for declaratory judgment.

In the combined counterclaim/cross-claim, the WCC noted the history already recited by us and also indicated that court clerks are members of the union, that the WCC is not the employer of the court clerks, that the WCC had not been a party to the CBA, that the WCC was not a party to the arbitration proceedings,

and that the WCC was not aware of the arbitration proceedings until after the arbitrator's ruling was issued. Count I of the counterclaim/cross-claim requested a court declaration that, under common-law contract principles, the CBA did not bind the WCC. Count II of the counterclaim/cross-claim requested a court declaration that, under common-law principles governing arbitrations, the arbitration award did not bind the WCC. Count III of the counterclaim/cross-claim requested a court declaration that LAO 2005-06 and the chief judge's subsequent enforcement order directing the county clerk to abide by LAO 2005-06 were presumptively valid, that the trial court lacked subject-matter jurisdiction to otherwise consider the validity of LAO 2005-06 and the chief judge's enforcement order, and that the county clerk was required to follow LAO 2005-06 and the enforcement order. Count IV of the counterclaim/cross-claim requested, in the alternative, a court declaration that LAO 2005-06 and the chief judge's enforcement order controlled the assignment of court clerks to serve in courtrooms notwithstanding any contrary provisions in the CBA and the arbitration award.

Subsequently, the union filed a supplemental motion for summary disposition in regard to its complaint, the WCC filed its own motion for summary disposition, the union filed an additional motion for summary disposition, but this time with respect to the WCC's counterclaim against the union, and the parties filed responses to the competing motions for summary disposition. We shall explore the nature of the summary disposition arguments in the context of our analysis of the issues on appeal. The trial court heard oral arguments on the motions and took them under advisement. In June 2010, in open court, the trial court rendered its ruling from the bench. The trial court held that the CBA and

the arbitration ruling governed and controlled the matter, suggesting that the WCC should have involved itself in the arbitration proceedings and criticizing the WCC for changing the rules and nullifying the CBA and the arbitration award. The trial court opined that the county and the WCC were constructively coemployers of the court clerks and that they should have presented a united bargaining front relative to the arbitration proceedings and interpretation of the CBA. The trial court indicated that it would not be appropriate for a WCC judge, nor any judge, to be able to dictate who serves the judge as his or her courtroom clerk, analogizing it to a judge's dictating which assistant prosecutor from the prosecutor's office must handle a criminal case over which the judge is presiding. The court stated that if a judge is assigned a court clerk pursuant to the CBA and the arbitrator's ruling and the assignment turned problematic, a change could be worked out, just like in any other department under the county's umbrella. The trial court found that court clerks assigned to courtrooms did not serve a core function to the extent that a judge should control the decision to employ a court clerk in his or her courtroom. The court concluded that LAO 2005-06 could not prevail over the arbitrator's ruling, which was never appealed, and that the arbitration decision was enforceable. The order entered by the trial court provided that, for the reasons stated on the record, the union's motion for summary disposition to enforce the arbitration award was granted and the WCC's competing motion for summary disposition was denied.

The WCC filed a claim of appeal, and on the WCC's motion, this Court granted a stay pending this appeal or further order of the Court. *AFSCME Council 25 v Wayne Co*, unpublished order of the Court of Appeals, entered July 20, 2010 (Docket No. 298655). Thereafter,

this Court granted the WCC's motion for clarification, directing the county clerk to assign court clerks to courtrooms in accordance with the procedure being utilized immediately before the trial court's summary disposition ruling. *AFSCME Council 25 v Wayne Co*, unpublished order of the Court of Appeals, entered November 5, 2010 (Docket Nos. 298655 and 300515[2]). The Supreme Court then denied an application for leave to appeal, but directed this Court "to decide this case on an expedited basis, in light of the importance of the issues . . . ." *AFSCME Council 25 v Wayne Co*, 488 Mich 1008 (2010).

II. ANALYSIS

A. STANDARD OF REVIEW

We review de novo a ruling on a motion for summary disposition, *Coblentz v City of Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006), constitutional issues, *Adair v Michigan*, 486 Mich 468, 477; 785 NW2d 119 (2010), the proper interpretation and application of a statute, *id.*, the construction of a court rule, *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008), and questions of law generally, *Oakland Co Bd of Co Rd Comm'rs*, 456 Mich 590, 610; 575 NW2d 751 (1998). We disagree with the union's argument that we should employ appellate-review standards applicable to arbitration proceedings or those found in the arbitration section of the CBA. As explained in detail later in this opinion, the WCC was not a party to, and did not participate in, the arbitration proceedings, and thus it had standing to independently attack the arbitration award outside the confines of an appeal of the arbitra-

---

[2] Docket No. 300515 pertained to a related contempt proceeding that we need not explore for purposes of this opinion.

tion award. Accordingly, this case does not entail an "appeal" of the arbitrator's ruling; rather, we are effectively addressing an appeal of a ruling in a declaratory judgment action, wherein the trial court declared as a matter of law that the arbitration ruling governed the assignment of court clerks to WCC courtrooms and not LAO 2005-06. Rulings in declaratory judgment actions are reviewed de novo on appeal. *Toll Northville Ltd v Northville Twp*, 480 Mich 6, 10; 743 NW2d 902 (2008).

### B. DISCUSSION

#### 1. COMMON-LAW, CONTRACT-RELATED LEGAL PRINCIPLES

We begin our analysis with a brief discussion of whether the WCC was bound by the CBA and the CBA-based arbitration ruling under common-law principles associated with contract formation and liability. The WCC was not a party to the CBA, it did not execute the document, and the WCC was not a party in the arbitration proceedings. "It goes without saying that a contract cannot bind a nonparty." *Equal Employment Opportunity Comm v Waffle House, Inc*, 534 US 279, 294; 122 S Ct 754; 151 L Ed 2d 755 (2002). Arbitration, which is a matter of contract, cannot be imposed on a party that was not legally or factually a party to the agreement wherein an arbitration provision is contained. *St Clair Prosecutor v AFSCME*, 425 Mich 204, 223; 388 NW2d 231 (1986); *Hetrick v David A Friedman, DPM, PC*, 237 Mich App 264, 267; 602 NW2d 603 (1999). In *Genesee Co Prosecuting Attorney v City of Flint*, 64 Mich App 569, 571; 236 NW2d 146 (1975), this Court stated:

> The issue is whether the plaintiff lacked capacity to attack the arbitration award. One not a party to an arbitration is not bound by the award. *Ford Motor Co v Wayne Circuit Judge*, 247 Mich 538; 226 NW 218 (1929). It

follows that a non-participant has standing to attack an arbitration award that makes determinations concerning its property or contractual rights. We agree with this well established rule. See *Orion Shipping & Trading Co v Eastern States Petroleum Corp*, 312 F2d 299 (CA 2, 1963) . . . , *Sloan v Journal Publishing Co*, 213 Or 324; 324 P2d 449 (1958), *Carpenters' Union v Citizens' Committee to Enforce Landis Award*, 333 Ill 225; 164 NE 393 (1928). We, therefore, conclude that the plaintiff has the legal capacity to maintain this action.[3]

As acknowledged by the WCC, nonsignatories of arbitration agreements can still be bound by an agreement pursuant to ordinary contract-related legal principles, including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel. *Thomson-CSF, S A v American Arbitration Ass'n*, 64 F3d 773, 776 (CA 2, 1995); see also *E I DuPont de Nemours & Co v Rhone Poulenc Fiber & Resin Intermediates, S A S*, 269 F3d 187, 198 (CA 3, 2001). We find that there was no documentary evidence indicating that the WCC had entered into a separate contractual relationship with anyone wherein the arbitration clause or any of the CBA language was incorporated by reference, nor was there any evidence that the WCC had engaged in conduct suggesting assumption of arbitration obligations or that the county was acting as the WCC's agent for purposes of collective bargaining and arbitration. *Thomson-CSF*, 64 F3d at 777. Furthermore, there was no evidence supporting imposition of a veil-piercing/alter-ego theory, given an absence of any fraud or indication that the WCC dominated and controlled

---

[3] The union does not claim that the WCC lacked standing to litigate the issues presented. Moreover, we find that the WCC has standing, given that the CBA and the arbitration award concern the WCC's courtroom rights and affect its substantial interest in internal court operations. See *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010).

the county relative to contract negotiations and arbitration. *Id.* In regard to estoppel, the federal court in *E I DuPont,* 269 F3d at 200, stated that "courts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract . . . that it finds distasteful." The court indicated that a party may be estopped from asserting that the lack of a signature on a written contract precludes enforcement of a certain clause when the party has consistently maintained that other provisions in the same contract should be enforced to benefit the party. *Id.* We are not prepared to invoke the estoppel theory, when the union fails to make an estoppel argument, and when the reason that the WCC rejected the CBA in regard to the arbitration of issues affecting court clerk assignments was of constitutional magnitude, rather than simply because the relevant CBA sections were distasteful. Additionally, we question whether the WCC "embraced" unchallenged sections of the CBA, as opposed to having merely accepted those sections as not infringing on judicial powers. In the context of collective bargaining and the circumstances of this case, it would be nonsensical to demand that the WCC reject the entire CBA, including sections that were not constitutionally offensive, as a prerequisite to later raising a nonsignatory defense.

In sum, there is no basis to conclude under common-law principles that the WCC was bound by the CBA and the arbitration award.

### 2. PERA AND INTRODUCTION TO THE INHERENT-JUDICIAL-POWERS DOCTRINE

We continue our analysis with a discussion of whether the CBA and the arbitration award govern the dispute and prevail by operation of PERA. PERA pro-

vides that "[a] *public employer* shall bargain collectively with the representatives of its employees . . . and may make and enter into collective bargaining agreements with those representatives." MCL 423.215(1) (emphasis added). The union maintains, without citation of authority, that the county is the "public employer" of court clerks for purposes of PERA. The WCC contends that the county and the county clerk are coemployers of court clerks, citing *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291, 297-300; 586 NW2d 894 (1998), and *Lapeer Co v Teamsters Local 214*, 1995 MERC[4] Lab Op 181. Neither the WCC nor the union assert that the WCC is the "public employer" of court clerks. The trial court stated that the county and the WCC are constructively coemployers of court clerks. The named parties to the CBA and the arbitration proceedings were the union and the county, not the WCC.

We need not determine which entity is properly designated as the public employer of court clerks for purposes of PERA, or whether court clerks have multiple public employers, because the question is irrelevant in regard to resolution of the particular issues in this case given the circumstances presented. In *St Clair Prosecutor*, 425 Mich at 207-208, the Court addressed multiple questions, including "whether the circuit court had jurisdiction to decide the arbitrability of an assistant prosecuting attorney's . . . removal from office under a collective bargaining agreement entered into by the county and the union without the participation of the prosecuting attorney[, and] whether the prosecutor is a coemployer with the county . . . ." The Court found that the county prosecuting attorney and the county were coemployers of assistant prosecuting attorneys for purposes of PERA; that while a public employer may

---

[4] Michigan Employment Relations Commission.

not refuse to bargain under PERA, there was no evidence that the union requested the prosecuting attorney to engage in collective bargaining; and that there was no evidence that the prosecuting attorney waived the right to bargain or acquiesced in such a waiver. *Id.* at 208. The Court held, in part, that the prosecuting attorney was not required to arbitrate the removal of the assistant prosecuting attorney under the collective-bargaining agreement executed by the county and the union, when the prosecuting attorney did not sign the agreement. *Id.* at 208, 237 ("[T]he prosecutor is not bound by an arbitration clause to which he was, in effect, not a party.").

Here, with respect to the CBA, there is no dispute that the WCC did not sign the document. Furthermore, there was no documentary evidence showing or suggesting that the WCC was asked or rejected a request to execute the CBA or engage in underlying CBA negotiations, that the WCC was actually involved in negotiations, or that the WCC designated the county as its representative relative to collective bargaining in order to protect its own interests. Moreover, there was no documentary evidence submitted to the trial court indicating that the WCC waived any claimed right to collectively bargain with the union, that the WCC acquiesced in any such waiver, or that the WCC expressed its consent to or approval of the pertinent provisions contained in the CBA.

With respect to the arbitration proceedings, there was no documentary evidence showing or suggesting that the WCC participated in the proceedings, that the WCC and the county joined forces in defending against the arbitrated grievances, or that the WCC designated the county as its representative relative to the arbitration proceedings. Additionally, there was no documen-

tary evidence submitted to the trial court indicating that the WCC waived any claimed right to participate in the arbitration proceedings, that the WCC acquiesced in any such waiver, or that the WCC approved of or adopted the arbitrator's award. In sum, there was no evidence whatsoever that the WCC had any association with or connection to the CBA and the arbitration proceedings. Indeed, the WCC's chief judge indicated in her letter to the county clerk that the WCC had not been aware of the arbitration proceedings until after the arbitrator's decision was issued.

The union argues that PERA requires parties to collectively bargain on matters concerning the terms and conditions of employment, which includes setting placement, transfer, appointment, and promotion criteria that would necessarily affect the assignment of court clerks to the WCC's courtrooms. And the CBA encompassed requisite matters by, in part, including provisions on the filling of vacancies, which mandated recognition and contemplation of minimum-service time and seniority. Therefore, according to the union, PERA demands that we honor the act with a holding that the CBA and the arbitrator's ruling govern the assignment of court clerks and prevail over LAO 2005-06 and any statutes to the contrary.

"The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service." Const 1963, art 4, § 48. "Acting pursuant to this explicit constitutional authorization, PERA was enacted by the Legislature in 1965." *Local 1383, Int'l Ass'n of Fire Fighters, AFL-CIO v City of Warren*, 411 Mich 642, 651; 311 NW2d 702 (1981). PERA provides public employees the right to form and join labor organizations, along with the right to negotiate with public employers in

good faith regarding hours, wages, and other terms and conditions of employment. *Id.* We have held that "PERA was intended by the Legislature to supersede conflicting laws and is superimposed even on those institutions which derive their powers from the Constitution itself." *Central Mich Univ Faculty Ass'n v Central Mich Univ*, 404 Mich 268, 279; 273 NW2d 21 (1978).

In *City of Warren*, 411 Mich 642, a promotion provision in a collective-bargaining agreement entered into under PERA conflicted with provisions of a city charter and the firefighters and police officers civil service system act, MCL 38.501 *et seq.* However, the Supreme Court held that "the contract provision governing promotions entered into under PERA [was] valid and enforceable." *City of Warren*, 411 Mich at 649. The Court noted that it had "consistently held that PERA prevails over conflicting legislation, charters, and ordinances in the face of contentions by cities, counties, public universities and school districts that other laws or the constitution carve out exceptions to PERA." *Id.* at 655. In *Kalamazoo Police Supervisors' Ass'n v City of Kalamazoo*, 130 Mich App 513, 524; 343 NW2d 601 (1983), this Court also acknowledged that "if there is a conflict between PERA and another statute, charter provision or constitutional provision affecting mandatory bargaining subjects, the provisions of PERA and Const 1963, art 4, § 48, must dominate . . . ."[5]

MCL 423.215(1) provides, in part:

---

[5] The fact that the WCC was not involved in negotiating the PERA-based CBA does not mean that we forego a PERA analysis and simply conclude that PERA is irrelevant. There is no argument that the CBA is generally invalid, unenforceable, or undeserving of recognition. Therefore, we must determine whether PERA principles demand enforcement of the entire CBA.

> Except as otherwise provided in this section, for the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith *with respect to wages, hours, and other terms and conditions of employment*, or the negotiation of an agreement, or any question arising under the agreement, and the execution of a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party, but this obligation does not compel either party to agree to a proposal or require the making of a concession. [Emphasis added.]

"The subjects included within the phrase 'wages, hours, and other terms and conditions of employment' are referred to as 'mandatory subjects' of bargaining." *Central Mich Univ*, 404 Mich at 277. "Once a specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject . . . ." *Id.* Promotion and appointment criteria, including seniority, as well as grievance procedures, are mandatory subjects of collective bargaining. *Id.* at 278; *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 55; 214 NW2d 803 (1974).

We agree that the provisions in the CBA that address intradepartmental job transfers and assignments, setting forth seniority and minimum-service criteria, and that address grievance procedures, including arbitration, do concern conditions of employment and are mandatory subjects of collective bargaining. Generally speaking, under the caselaw already cited, a PERA-based contract prevails in most instances even when in conflict with other authorities. However, the WCC invoked its constitutional powers as part of the judiciary in promulgating LAO 2005-06 and in rejecting and failing to heed the CBA and the arbitration ruling. Some of the PERA caselaw already discussed, while not involving the judicial branch's inherent constitutional

powers, suggests that PERA may prevail over conflicting constitutional provisions; again, PERA is grounded in the Michigan Constitution. The union itself does not make this argument, and it states that PERA prevails over inconsistent laws, "save the Constitution."

We hold that a PERA-based contract and related arbitration award that infringe on the judicial branch's inherent constitutional powers cannot be enforced to the extent of the encroachment.[6] See *Second Judicial Dist Court Employees & Judge v Hillsdale Co*, 423 Mich 705, 717; 378 NW2d 744 (1985) ("Each branch of government has inherent power to preserve its constitutional authority."). We have not been directed to any cases that suggest that if honoring PERA impinges on the judiciary's inherent constitutional authority, PERA governs and prevails. The inherent-powers doctrine, which has been recognized for over 120 years, "is derived from the separation of governmental powers set forth principally in Const 1963, arts 4-6, relating to the authorities of the legislative, executive, and judicial branches of government, and Const 1963, art 3, § 2 . . . ."[7] *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 140; 719 NW2d 553 (2006) (opinion by MARKMAN, J.). The "doctrine is rooted in the constitutional command that the judicial power of this state is vested exclusively in 'one court of justice['] [under] Const 1963, art 6, § 1."[8] *Id.* at 145.

---

[6] We are not suggesting that if a court is indeed a party to a collective-bargaining agreement, it can later refuse to honor its own agreement on the basis that the court's constitutional powers are invaded by implementation of the agreement.

[7] "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2.

[8] Const 1963, art 6, § 1, provides:

In *74th Judicial Dist Judges v Bay Co*, 385 Mich 710; 190 NW2d 219 (1971), the plaintiff district court judges sought, in part, injunctive relief prohibiting MERC from conducting hearings on a charge of unfair labor practices leveled against a judge, and the trial court permanently enjoined MERC from proceeding. Our Supreme Court, in reversing the trial court's order, held that PERA provisions empowering MERC to act did not encroach on "the constitutional and inherent powers of the judiciary" and that MERC could properly exercise its jurisdiction under PERA. *Id.* at 729. While under the circumstances presented in *74th Judicial Dist Judges* there was no infringement on the judicial branch's inherent powers, the Court's analysis implicitly, yet strongly, indicated that if such an infringement does occur, PERA will not control.

The proposition that PERA must bow to the judiciary's inherent constitutional powers was made abundantly clear in *In re Petition for a Representation Election Among Supreme Court Staff Employees*, 406 Mich 647; 281 NW2d 299 (1979). In that case, a union, acting pursuant to PERA, petitioned for an election among certain Michigan Supreme Court clerical employees and proposed a bargaining unit comprised of those employees. MERC issued a finding that it had jurisdiction over the matter and ordered an election. MERC also rejected a separation-of-powers argument, observing that clerical employees did not exercise the powers of any branch of the government. *Id.* at 662. Our Supreme Court held:

> The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house.

> This is a case of first impression. No Michigan or foreign opinion has been cited to us, nor did our research reveal any, where a quasi-judicial agency assumed to bring the Supreme Court before it for adjudication. However, those are the facts of this case. . . . MERC . . . has attempted to take jurisdiction over the Michigan Supreme Court to determine a union representation election proceeding in which this Court would be a defendant.
>
> We hold that Const 1963, art 3, § 2, headed separation of powers of government, precludes MERC's assumption of such jurisdiction over the Michigan Supreme Court. [*Id.* at 660-661.]

Although it concerned a dispute between the legislative and executive branches of government, this Court's decision in *Beadling v Governor*, 106 Mich App 530, 536-537; 308 NW2d 269 (1981), makes clear that the separation-of-powers doctrine prevails over PERA: "While the constitution expressly permits the Legislature to enact laws for the resolution of disputes involving public employees, Const 1963, art 4, § 48, that provision is inapplicable in this situation since it would otherwise substantially impair the separation of powers clause."

In *Irons v 61st Judicial Dist Court Employees Chapter of Local No 1645*, 139 Mich App 313, 321; 362 NW2d 262 (1984), this Court recognized the principle that application of PERA to the courts cannot occur if it would "violate the constitutional mandate of separation of powers."

Accordingly, if indeed application of PERA impinges on the judiciary's inherent constitutional powers, PERA cannot prevail. We also emphasize that the sections in the CBA generally governing the filling of vacancies and intradepartmental assignments are not rendered null and void by our ruling today. Rather, they are still wholly applicable, except that we ultimately

carve out, for reasons set forth later in this opinion, a small exception with respect to the placement of a court clerk in a courtroom in order to preserve the judiciary's constitutional authority. Before analyzing whether there was an unconstitutional infringement of the judicial branch's authority with respect to the assignment of court clerks to WCC courtrooms under the CBA and the arbitration ruling, we shall first examine additional statutory arguments.

3. ADDITIONAL STATUTORY PROVISIONS AND CONSIDERATIONS

We begin by providing some background regarding the county clerk and the judicial branch and the interrelationship between the two. "There shall be elected for four-year terms in each organized county a . . . county clerk . . . whose duties and powers shall be provided by law." Const 1963, art 7, § 4. "The clerk of each county organized for judicial purposes . . . shall be clerk of the circuit court for such county." Const 1963, art 6, § 14. Consistently with this constitutional provision, MCL 600.571(a) provides that "[t]he county clerk of each county shall . . . [b]e the clerk of the circuit court for the county." In *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW2d 452 (2003), the Michigan Supreme Court noted that, "[u]nder our Constitution, the county clerk serves in the unique posture of being both an executive officer and an officer of the judicial branch." The Court held:

> The constitutionally created office of the clerk of the circuit court must have the care and custody of the court records and can perform noncustodial ministerial functions of the court. The custodial function requires that the clerk act as guardian of the records, providing for their safekeeping. The clerk's noncustodial ministerial duties are directed by the Court, as the determination of the precise noncustodial ministerial duties to be performed is a matter

of court administration entrusted exclusively to the judiciary under Const 1963, art 3, § 2 and Const 1963, art 6, §§ 1, 5. [*Id.* at 170-171.]

The union cites MCL 600.579(1) in support of the argument that the county clerk has the authority to make court clerk assignments to courtrooms absent approval and acceptance by WCC judges.[9] MCL 600.579(1) provides:

> In counties having a population of more than 1,000,000 or that shall hereafter attain a population of more than 1,000,000 and that have adopted civil service under Act No. 370 of the Public Acts of 1941, as amended, being sections 38.401 to 38.428 of the Compiled Laws of 1948, the county clerk shall appoint or promote from the classified eligible list of the civil service a chief deputy circuit court clerk and at least 1 deputy circuit court clerk for each acting circuit judge in the county.

We take judicial notice under MRE 201 that Wayne County has a population that exceeds 1,000,000, and it has adopted the county employees' civil service act, MCL 38.401 *et seq.*, as reflected in *Molis Estate v Wayne Co Bd of Auditors*, 373 Mich 172, 174; 128 NW2d 473 (1964). As argued by the union, MCL 600.579(1) does not reference any requirement that a judge or court approve the county clerk's appointment or promotion of a court clerk to serve a circuit court judge. On the other hand, MCL 600.571(c) provides that the county clerk shall "[a]ppoint in counties with more than 1 circuit judge *or* having more than 100,000 population but less than 1,000,000 a deputy for each judge *and approved by the judge* to attend the court sessions." (Emphasis added.) In general, the "disjunctive term 'or' refers to a

---

[9] The parties apparently accept that the county clerk was bound by the CBA and the arbitration ruling, and the county clerk has not intervened in the suit.

choice or alternative between two or more things," *Yankee Springs Twp v Fox*, 264 Mich App 604, 608; 692 NW2d 728 (2004), and Wayne County certainly has more than one circuit court judge. We also note the language in MCL 50.63, which provides that "[e]ach county clerk shall appoint 1 or more deputies, *to be approved by the circuit judge*, . . . and the deputy or deputies . . . may perform the duties of . . . clerks." (Emphasis added.) This provision concerns the general hiring of deputy clerks, which apparently requires judicial approval.

We decline to rule that MCL 600.579(1), which does not reference the need for judicial approval, resolves the dispute in favor of the union, considering that, for the same reasons that we rejected the union's PERA argument, the judicial branch's inherent constitutional powers take precedence over the statute. A fundamental and indisputable tenet of law is that a constitutional mandate cannot be restricted or limited by the whims of a legislative body through the enactment of a statute. *Stanhope v Village of Hart*, 233 Mich 206, 209; 206 NW 346 (1925) ("The provisions of the Constitution clearly point decision herein, and we find no occasion to go to statutory provisions on the same subject[;][t]he Constitution controls . . . ."); see also *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 710; 614 NW2d 607 (2000) (stating that a statute cannot contravene "the dictates of our state or federal constitution").

We also decline to rule that either MCL 50.63 or MCL 600.571(c), which incorporate a judicial-approval requirement, supports the WCC's position to the extent that it resolves the case and makes it unnecessary to reach the constitutional issues. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993) ("[W]e will not reach constitutional

issues that are not necessary to resolve a case."). First, there is some obvious tension between MCL 600.579(1) and MCL 600.571(c), and MCL 50.63 does not technically concern the assignment of a previously hired court clerk to a courtroom. More importantly, even if we determined that the judicial-approval provisions in MCL 50.63 and MCL 600.571(c) controlled over or irrespective of MCL 600.579(1), there would still arise a conflict between those statutes and the PERA-based CBA. And as reflected already in this opinion, PERA can supersede, dominate, and prevail over conflicting legislation. *City of Warren*, 411 Mich at 655; *Central Mich Univ*, 404 Mich at 279; *Kalamazoo Police Supervisors' Ass'n*, 130 Mich App at 524. Overall, placing any reliance on the statutes is problematic, and the Michigan Constitution provides a clear path in resolving the dispute.

The union also places reliance on MCL 38.415[10] and 38.416,[11] which are provisions contained in the county

---

[10] MCL 38.415 provides:

  Whenever possible, vacancies shall be filled by promotion. Promotion shall be made from among employees qualified by training and experience to fill the vacancy, and whose length of service entitles them to consideration. The commission shall, for the purpose of promotion, rate such employees so qualified on the basis of their service record if maintained, experience in the work involved in the vacant position, training and qualification for such work, seniority and war service ratings. Seniority shall be controlling only when other factors are equal. Only 1 name, the highest on the list of ratings, shall be certified. The appointing authority shall then appoint the person so qualified forthwith, or elect to make an original appointment, in which event the procedure for original appointments hereinbefore provided shall be followed.

[11] MCL 38.416 provides, in part, that "[a]ny officer or employee in the classified civil service may be removed, suspended or reduced in rank or compensation by the appointing authority, after appointment or promotion is complete, by an order in writing, stating specifically the reasons therefor."

employees' civil service act, and which, according to the union, do not give any authority to the WCC or any court to dictate the assignment of a court clerk to a courtroom or the removal of a court clerk from a courtroom.[12] Regardless of whether the union is accurately construing these statutes, to the extent that they infringe on the judicial branch's inherent constitutional powers, they also succumb to the primacy of the Michigan Constitution.

#### 4. APPLICATION OF THE INHERENT-JUDICIAL-POWERS DOCTRINE

Having found, generally speaking, that the judiciary's inherent constitutional powers take precedence over PERA and the other statutory provisions cited by the union, we must now determine whether the act of assigning or selecting a court clerk for courtroom duty is a power that actually falls within the inherent-powers doctrine, so that the judiciary ultimately has the exclusive authority to make the decision regardless of seniority, the CBA, and the arbitration award. We find that *Judicial Attorneys Ass'n*, 459 Mich 291, and *Lapeer Co Clerk*, 469 Mich 146, control our analysis and demand that we hold in favor of the WCC.

In *Judicial Attorneys Ass'n*, 459 Mich at 294, our Supreme Court found that MCL 600.593a(3) to (10) and "parallel provisions of [MCL 600.591, 600.837, 600.8271, 600.8273, and 600.8274] of 1996 PA 374, concerning employees of the circuit, probate, and district courts, are unconstitutional." 1996 PA 374 provided that Wayne County or a local judicial council created under the act became the employer of WCC

---

[12] Section 14.01 of the CBA provides that, "[t]o the extent they are not in conflict with other provisions of this Agreement, the existing Wayne County Civil Service Rules ... are incorporated by reference into this Agreement."

employees, rather than the State Judicial Council abolished by the act. *Judicial Attorneys Ass'n*, 459 Mich at 294. The Court noted that the option to create a local judicial council as the employer had already expired. *Id.* at n 1. The Court found that the statutory provisions constituted an unconstitutional invasion of the judicial branch's authority to control its internal operations. *Id.* at 301, 304.

The Court began its analysis by stating that "the separation of powers doctrine does not require so strict a separation as to provide no overlap of responsibilities and powers" and that "[i]f the grant of authority to one branch is limited and specific and does not create encroachment or aggrandizement of one branch at the expense of the other, a sharing of power may be constitutionally permissible." *Id.* at 296-297. The critical questions, as viewed by the Court, were whether the "judicial branch's powers necessarily include the administrative function of controlling those who work within the judicial branch, and, if so, whether the legislatively prescribed sharing of personnel functions delineated in [MCL 600.593a] is sufficiently limited and specific so as not to encroach on the exercise of the constitutional responsibilities of the judicial branch." *Id.* at 297. Here, with respect to setting the criteria for purposes of a court clerk assignment and in regard to an assignment decision, there is *no* sharing of power with the judicial branch, where the CBA, as agreed to by the union and the county (legislative branch), exclusively governs the process. MCL 600.593a(5), which was struck down as unconstitutional in *Judicial Attorneys Ass'n*, preserved a limited role for the chief judge of the WCC in those aspects of decision-making relative to court personnel, yet the Supreme Court still found the statutory scheme constitutionally flawed. *Judicial Attorneys Ass'n*, 459 Mich at 302. Again, in the case at bar,

the WCC does not even play a limited role in the assignment process and determination.

The Court in *Judicial Attorneys Ass'n* observed that it was well established that the management of court personnel "falls within the constitutional authority and responsibility of the judicial branch" and that "[t]he power of each branch of government within its separate sphere necessarily includes managerial administrative authority to carry out its operations." *Id.* at 297. The Court also observed:

> Despite the complications of the trial court environment, the case law, taken as a whole, has come to strongly affirm that the fundamental and ultimate responsibility for all aspects of court administration, including operations and personnel matters within the trial courts, resides within the inherent authority of the judicial branch.
>
> \*   \*   \*
>
> ". . . Employing and managing personnel to carry out day-to-day operations is one of the most basic administrative functions of any branch of government. This Court has already suggested that, pursuant to the doctrine of separation of powers, one branch of government should not be subject to oversight by another branch in personnel matters. . . ."
>
> We agree with plaintiffs and the Court of Appeals majority that [MCL 600.593a(3)] is not a sufficiently limited exercise by one branch of another branch's power, and therefore that it impermissibly interferes with the judiciary's inherent authority to manage its internal operations. . . .
>
> \*   \*   \*
>
> . . . The judicial branch is constitutionally accountable for the operation of the courts and for those who provide court services . . . . [*Id.* at 299-302 (citations omitted).]

Here, we hold that the assignment or selection of a particular court clerk to serve in a judge's courtroom clearly falls under the umbrella of the judiciary's administrative and managerial authority to carry out the court's day-to-day internal operations and to control personnel matters with regard to an individual, a court clerk, who indisputably is providing court services.

The union attempts to make a distinction between the WCC's having control over the operation and function of the courtroom, which power the union concedes is beyond dispute, and the WCC's having control over personnel who perform duties in the courtroom. Stated otherwise, the union accepts that a WCC judge can direct the activities of a court clerk once the clerk is assigned to the judge's courtroom, but argues that the judge does not have the authority to determine which particular court clerk is assigned to the courtroom in the first place. We disagree and hold that the judicial branch's inherent constitutional powers encompass both the selection of a court clerk to work in a courtroom and the control over the clerk in the courtroom after the selection is made. Controlling a court's personnel matters and its daily internal operations, which are powers held by the judicial branch as indicated in *Judicial Attorneys Ass'n*, necessarily include deciding which court clerk will be assigned to work with a judge in the judge's courtroom. We find that it would be constitutionally unsound to conclude that a judge can dictate the activities of a court clerk once the court clerk is assigned to the judge's courtroom, but that the judge can have no relevant say in regard to which court clerk will work with the judge on a day-to-day basis in conducting the business of the court.

We reject the trial court's analogy that allowing the WCC to govern the court-clerk-assignment determina-

tion is akin to a judge's dictating which assistant prosecutor from the prosecutor's office must handle a criminal case over which the judge is presiding. A court clerk who is performing court functions on behalf and at the direction of a judge simply does not have the same status as a party or attorney who is merely appearing before a judge to argue a case. A prosecutor is not performing work or providing court services for the benefit of the judge and persons appearing in the court.

Under the CBA, as interpreted by the arbitrator, a WCC judge is effectively deprived of any meaningful voice with respect to which court clerk serves in his or her courtroom. A judge has no formally recognized control over the assignment or removal decision; there is an absence of empowerment granted to the judiciary. We acknowledge that the CBA requires the placement of a qualified clerk in a courtroom, but there is no procedural mechanism that requires the county clerk, the county, or the union to take into consideration a judge's input with regard to whether a court clerk is qualified. If a judge attempted to demand that the county clerk remove a court clerk deemed unqualified by the judge, or if a judge sought to prevent the assignment of a court clerk to his or her courtroom on the basis that the clerk was unqualified, the judge could be wholly ignored without any legal consequences or ramifications. Even when, in the spirit of cooperation, a county clerk works with a judge and respects the judge's wishes, a disgruntled court clerk can invoke the grievance procedures, possibly culminating in arbitration. And a judge or the WCC, not being a party to the CBA and, under the union's argument, not having constitutional authority to interfere with CBA procedures, could not become involved in the grievance procedures. At oral argument, when asked what the WCC could do if the county clerk found a court clerk qualified for

assignment to a courtroom but the judge to whom the court clerk is to be assigned thinks differently, the union's counsel responded that the WCC could file a lawsuit. Aside from the fact that such a suit would be overly burdensome on the judiciary, we fail to see how the WCC could succeed in the litigation if the union's stance controlled, given its position that the WCC has no right to play a role in the assignment of court clerks. We conclude that a judge has the exclusive constitutional authority to select a court clerk who the judge opines is the best suited to assist the judge in effectively and efficiently operating the judge's courtroom.

Furthermore, *Lapeer Co Clerk*, 469 Mich 146, lends further support for our conclusion. In *Lapeer Co Clerk*, *id.* at 149, our Supreme Court held that a county clerk, serving as clerk of the circuit court, "must have the care and custody of the court records" and "is to perform ministerial duties that are noncustodial as required by the court." Reviewing historical instances in which circuit court clerks, i.e., county clerks, have been assigned noncustodial, ministerial tasks, the Court stated:

> Court clerks [have] ... computed amounts due on bonds, generated transcripts, filed transcripts, entered and docketed judgments, advertised writs of judgment, certified and filed stipulations, received court papers, transmitted certified copies of proceedings to the Supreme Court, certified various court documents, and accepted court filings. Court clerks could not undertake nonministerial functions, such as assessing damages in a contested action, exercising any judicial power over individuals, or taking complaints and issuing warrants. In addition, it was well understood that these noncustodial ministerial functions were subject to change. [*Id.* at 158-159 (citations omitted).]

The Court further ruled that "the judiciary is vested with the constitutional authority to direct the circuit

court [county] clerk to perform noncustodial ministerial duties pertaining to court administration as the Court sees fit." *Id.* at 164. The constitutional authority "includes the discretion to create duties, abolish duties, or divide duties between the clerk and other court personnel, as well as the right to dictate the scope and the form of the performance of such noncustodial ministerial duties." *Id.*

We find that the directives contained in LAO 2005-06, which required the county clerk to assign a court clerk to a presiding judge's courtroom on the basis of the judge's selection of a clerk from the appropriate pool, constitute noncustodial ministerial tasks relative to the division of duties and the scope and the form of performances within the circuit court. As such, LAO 2005-06 was a proper exercise of the WCC's exclusive judicial authority under the Michigan Constitution, and it was permissible because it concerned "internal court management," MCR 8.112(B)(1).

We find additional support for our position in *Rutledge v Workman*, 175 W Va 375; 332 SE2d 831 (1985), wherein the West Virginia Supreme Court of Appeals considered whether an elected circuit court clerk could remove and replace a deputy circuit court clerk when a judge entered an order prohibiting the change. The elected circuit court clerk had acknowledged that there was statutory authority requiring court approval before her initial hiring decision, but argued that "she has absolute, complete, and unfettered discretion to fire, assign, and reassign personnel in the office of the circuit clerk." *Id.* at 377. Similar to the Michigan Constitution, the West Virginia Constitution provided for a unitary court system. *Id.* at 379, citing W Va Const, art VIII, § 1 *et seq.* The court, examining New Jersey caselaw that had addressed the issue, stated:

The New Jersey courts have decided cases on this subject and their reasoning is persuasive. The county clerk is the New Jersey equivalent of the West Virginia circuit court clerk. Because these clerks are elected, they have a hybrid status--half county official: half judicial officer. Nevertheless, these clerks are fully answerable to the judicial system. When a conflict arose between the assignment judge, the chief administrator of New Jersey's county judicial system, and county officials, the court upheld the judge's constitutional power to administer the judiciary. The court stated:

"The power of the assignment judge to select and assign as his assistants those who satisfy his needs from the coterie of county employees stems from the inherent power of the courts as implemented by R. 1:33-3(b). And although these assistants may remain county employees for the purpose of payment of their remuneration, they nevertheless serve under the control and direction of the assignment judge in the unclassified category and at his pleasure." *Matter of Court Reorganization Plan; etc.*, 161 N.J. Super. 483, 391 A.2d 1255, 1260 (App. Div. 1978) *aff'd o.b.* 78 N.J. 498, 396 A.2d 1144 (1979).

And since this power to regulate the conduct of the courts is constitutional, it transcends any legislative directives. 161 N.J. Super. 483, 391 A.2d at 1260. In the same manner, the *West Virginia Constitution* mandates that we, and the circuit court judges administer the judicial system with dispatch. Although the circuit court clerks are more than our minions, the constitution's mandate for effective justice guides their action as well as ours. They must aid the administration of justice or face censure. [*Rutledge*, 175 W Va at 379-380.]

The West Virginia court also relied on W Va Const, art VIII, § 9, which established the office of the clerk of the circuit court under the judicial article, to conclude that the circuit court clerk's duties must be analyzed in the framework of the judicial system. *Rutledge*, 175 W Va at 380. In Michigan, the county clerk's role as clerk of the circuit court was also established under the

judicial article, Const 1963, art 6, § 14, and the relationship between the clerk of the circuit court and the judicial branch in Michigan is comparable to the relationship between the two that exists in West Virginia. See *Lapeer Co Clerk*, 469 Mich 146.

Later, in *State ex rel Core v Merrifield*, 202 W Va 100, 109; 502 SE2d 197 (1998), the West Virginia Supreme Court of Appeals upheld that part of a general order which provided that each circuit judge had the ultimate authority to "select and assign as his Courtroom Clerk that individual whom most satisfies his needs from the coterie of deputy clerks."

We wholeheartedly agree with the analysis and conclusion reached by the West Virginia and New Jersey courts.

### 5. ALLEGED INFRINGEMENT ON THE POWERS OF THE LEGISLATIVE BRANCH AND ASSOCIATED CASES

The union asserts that LAO 2005-06 violates the separation-of-powers doctrine in that it infringes on the constitutional authority of the county, as a legislative branch of government, to have control over the employment conditions of court clerks as bargained for in the CBA. We first note that the county itself has not voiced such an infringement. Regardless, we do not agree that the assignment of a *court* clerk to a WCC *courtroom* is a subject matter falling within the powers of the legislative branch; it is patently a judicial matter. Assuming that the county's role in generally setting the work conditions and duties of court clerks through collective bargaining is of constitutional magnitude relative to the powers of the legislative branch, the judicial branch must nonetheless be permitted to take control over particular matters when necessary to satisfy constitutional demands, even if closely related to legislative

matters. And any incursion by the judiciary into the county's general constitutional territory that results from our ruling that grants the judiciary control over courtroom assignments is "sufficiently limited and specific so as not to encroach on the exercise of the constitutional responsibilities of the [legislative] branch." *Judicial Attorneys Ass'n*, 459 Mich at 297. The CBA is an expansive document covering myriad matters of employment conditions pertaining to court clerks, as well as other union members, none of which bargained-for conditions are affected by our ruling, except for the criteria on filling vacancies, and then only to the extent that the matter concerns a courtroom assignment.[13] The WCC has made it clear that, aside from this minimally intrusive yet constitutionally mandated exception, it would honor the provisions in the CBA. The union attempts to support its position by citation of *Wayne Circuit Judges v Wayne Co*, 386 Mich 1; 190 NW2d 228 (1971), *74th Judicial Dist Judges*, 385 Mich 710, *Bartkowiak v Wayne Co*, 341 Mich 333; 67 NW2d 96 (1954), *Sabbe v Wayne Co*, 322 Mich 501; 33 NW2d 921 (1948), *Bischoff v Wayne Co*, 320 Mich 376; 31 NW2d 798 (1948), and *Beadling*, 106 Mich App 530. These cases do not require a different outcome here because they are either factually or legally distinguishable and thus not pertinent to the specific legal questions that we have addressed today, or they actually support the WCC's position, or they are not as closely on point as *Lapeer Co Clerk*, 469 Mich 146, and *Judicial*

---

[13] We emphasize, however, that this opinion should not be read as a ruling that all remaining provisions of the CBA are constitutionally acceptable, because those provisions are not before us. Further, while we are only concerned with the assignment of court clerks to courtrooms, nothing in this opinion should be interpreted as necessarily limiting its potential application to court clerk assignments.

*Attorneys Ass'n,* 459 Mich 291, wherein our Supreme Court has embraced recognition of the judicial branch's constitutional powers.

### III. CONCLUSION

We hold that under the judicial branch's inherent constitutional authority the WCC's judges have the exclusive authority to make the determination with respect to the assignment or selection of a particular court clerk to serve in a judge's courtroom. Promulgation of LAO 2005-06 constituted a proper exercise of the WCC's authority, and the WCC was not bound by the CBA, nor the arbitrator's ruling, on the narrow issue of courtroom assignments.

We reverse and remand for entry of judgment in favor of the WCC. We do not retain jurisdiction. Considering that our Supreme Court directed us to decide this case on an expedited basis in light of the important issues at stake, we order that this opinion, i.e., our judgment, is to take immediate effect pursuant to MCR 7.215(F)(2). No taxable costs are awarded.

STEPHENS and M. J. KELLY, JJ., concurred with MURPHY, C.J.